UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARA BAUMEISTER,<br>Plaintiff,<br>v.<br>NOUVEAU ESSENTIALS MARKETING, LLC,<br>Defendant. | Case No. 25-cv-10724-RFL<br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br>Re: Dkt. No. 22 |

Plaintiff brought this action to recover for Nouveau's alleged violations of the Telephone Consumer Protection Act. Nouveau now moves to compel arbitration under a website agreement that it contends Plaintiff entered into with non-party Stim Programs and of which Nouveau was undisputedly an intended third-party beneficiary. For the reasons set forth below, the motion is **GRANTED**.

## I. BACKGROUND

Nouveau relies on the declaration of Blaine Beichler, its Head of Operations and Business Development, to establish the existence of an agreement to arbitrate. As Beichler explains, "Nouveau provides interested consumers with information concerning money-saving resources and promotional deals, both directly and via certain third-party partners," including Stim. (Dkt. No. 22-1 ¶ 3.) Consumers may sign up through Stim's website to receive email and text message marketing from both Stim and its partners (like Nouveau) about these resources and deals. (*See id.* ¶ 4.) Nouveau's records reflect that Plaintiff signed up through Stim's website in March 2025 for email marketing. (*See id.* ¶¶ 11-13, 32-33, 35.)

As relevant here, the website presented Plaintiff with the following prompt, through

which she entered her email address and pushed a "Continue" button[1]:




Directly below the field to enter her email address and directly above the Continue button, the prompt included the following notice: "By clicking Continue, I accept the Terms and Conditions (with Arbitration Agreement) . . . ." The blue, underlined "Terms and Conditions" text was hyperlinked to a copy of the terms. (*See id.* ¶¶ 14-16.) Those terms included an "agree[ment] to arbitrate any dispute related to any emails, text messages or calls [that the user] may receive from" Stim, its "advertisers marketing partners, or clients." (*See id.* at 19.)[2]

## II. LEGAL STANDARD

Courts apply a summary judgment standard in evaluating motions to compel arbitration.

---

[1] On subsequent screens, Plaintiff entered identifying information (*e.g.*, name, address), as well as her phone number, after which she also checked a box labeled, "I consent to be texted as described above." (*See* Dkt. No. 22-1 ¶¶ 18-19, 32-33.) As explained below, the email signup prompt provides a sufficient basis on which to grant the motion. Accordingly, this Order does not describe the text message signup prompt or address whether Plaintiff validly entered into an agreement to arbitrate through it.

[2] All citations to page numbers in filings on the docket refer to ECF page numbers.

*See Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1200 (9th Cir. 2024). The Federal Arbitration Act (the "FAA") "limits the court's role to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citation and quotation marks omitted). Plaintiff does not dispute that the FAA applies to the agreement in question or that her claim falls within the scope of that agreement's arbitration provisions. Instead, the parties' principal dispute concerns whether Plaintiff entered into an agreement to arbitrate. "The party moving to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of the evidence." *Platt v. Sodexo, S.A.*, 148 F.4th 709, 718 (9th Cir. 2025) (citation and quotation marks omitted). This "standard is not overly demanding." *See Mireles v. Wells Fargo Bank, N.A.*, 845 F. Supp. 2d 1034, 1070 (C.D. Cal. 2012).

## III. ANALYSIS

### A. Existence of an Agreement to Arbitrate

#### 1. Evidence that Plaintiff Clicked to Accept the Terms and Conditions

Through Beichler's declaration, Nouveau has carried its burden to establish that Plaintiff clicked "Continue" to accept the Terms and Conditions. Plaintiff objects to the reliability of Beichler's declaration on five grounds: (1) lack of personal knowledge; (2) lack of foundation; (3) failure to authenticate; (4) speculation; and (5) hearsay.

As an initial matter, evaluating motions to compel arbitration "generally does not require an analysis of the admissibility of the evidence presented." *See Atl. Home Health Care, LLC v. Wynwest Advance LLC*, No. 25-cv-04365-RFL, 2025 WL 2603100, at *4 (N.D. Cal. Sept. 9, 2025) (citation omitted). Courts will accept evidence "so long as the contents are capable of presentation in an admissible form at trial." *See Lomeli v. Midland Funding, LLC*, No. 19-cv-01141-LHK, 2019 WL 4695279, at *7 (N.D. Cal. Sept. 26, 2019) (citations omitted). Beichler's declaration satisfies that standard. He explains that "[a]s a third-party marketing partner of Stim Programs, Nouveau reviews the consumer opt-in flows and Terms and Conditions of Stim Programs before they are published, and Stim Programs is contractually required to inform

[Nouveau] of any proposed changes to those opt-in flows or Terms and Conditions before they are published." (Dkt. No. 22-1 ¶ 5.) He then states that "[i]n [his] position as Nouveau's Head of Operations and Business Development, [he is] responsible for reviewing Stim Programs' Terms and Conditions before any changes, as well as regularly auditing their (i) compliance with their requirement to inform [him] of any changes, and (ii) use of the agreed-upon consumer opt-in flows and terms on their website." (*Id.* ¶ 6.) He also explains that "[t]hrough [his] regular auditing of Stim Programs' consumer opt-in flows, [he has] regular access to and first-hand knowledge of [the] Stim Programs' online opt-in process [that is] described" in his declaration. (*Id.* ¶ 7.) Finally, he states that consumer opt-in "data is regularly captured in real time by Stim Programs and conveyed to Nouveau, also in real time, which occurred with Plaintiff's opt-in data here, [that] [Nouveau] maintain[s] [this data] in the ordinary course of business[,] [and that Beichler] routinely access[es] and use[s] this type of information in the ordinary course of [his] job responsibilities for Nouveau." (*Id.* ¶ 35.)

These averments, which Plaintiff does not address, confirm that Beichler, without relying on hearsay, has personal knowledge of the facts attested to, has laid a foundation for the information provided, has authenticated the information provided, and is not speculating in his declaration. *See, e.g.*, *Hodge v. NAPA Genuine Auto Parts*, No. 25-cv-02242-PHX, 2026 WL 764679, at *4 (D. Ariz. Mar. 18, 2026) ("Master's job title and description of his duties are sufficient to establish his personal knowledge of the steps a Dasher must take (and the screens Dashers must encounter) when signing up for a Dasher account and using the Dasher app." (citations omitted)).

Plaintiff also asserts that while someone may have entered her email address and clicked Continue on Stim's website, and may then have entered her other personal information on the next screen (including her name, address, date of birth, and phone number), whoever did it wasn't her. She relies solely on a declaration in which her attorney explains that counsel for Nouveau shared the IP address from which the opt in occurred, when Plaintiff's counsel entered that IP address into four different websites the websites returned a geolocation of San Jose,

California, and Plaintiff lives over 180 miles from San Jose. (*See* Dkt. No. 34-1 ¶¶ 4-6.) Plaintiff's counsel, however, does not purport to have any specialized knowledge about geolocation using IP addresses and offers no explanation as to the reliability of the websites used. Counsel's declaration, accordingly, is of limited probative value and is insufficient, standing alone, to raise a genuine dispute of material fact. *See, e.g.*, *John Charles Designs, Inc. v. Queen Int'l Design, Inc.*, 940 F. Supp. 1516, 1521 n.4 (C.D. Cal. 1996) (according "little evidentiary weight" to attorney declaration because declarant "does not qualify as an expert"). Plaintiff offers no other evidence to support her contention that she never signed up for marketing messages through Stim's website, including, for example, a declaration in which she avers that she never did so. *See, e.g.*, *Bryant v. JPMorgan Chase Bank, N.A.*, 763 F. Supp. 3d 946, 950 (C.D. Cal. 2025) ("Plaintiff does nothing to create a genuine issue of material fact as to the existence of an agreement. Plaintiff does not assert that he did not sign up for CreditWorks. In fact, Plaintiff has not provided a sworn affidavit contesting any aspect of Smith's affidavit. Thus, there is no genuine dispute of material fact, and the Court may decide as a matter of law that the parties entered into an agreement to arbitrate." (citation omitted)). Nor does she submit any evidence indicating that the other personal information entered on the next screen as described by Beichler was inaccurate. Nouveau has accordingly shown by a preponderance of the evidence that Plaintiff entered her email address and pushed Continue when presented with the above prompt on Stim's website.

**2. Contract Formation**

Plaintiff nonetheless contends that, even if she had entered her email address and pushed Continue, no contract was formed. The parties agree that California law governs the issue of contract formation. They also agree that the issue of contract formation must be evaluated under a theory of inquiry notice. Under California law, "an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those

terms." *Berman*, 30 F.4th at 856 (citation omitted). Both prongs are satisfied here.

**a. Reasonably Conspicuous Notice**

Nouveau has shown reasonably conspicuous notice of the Terms and Conditions. The Ninth Circuit recently described the test for reasonably conspicuous notice as follows:

> This test has two aspects: the visual design of the webpages and the context of the transaction. Both aspects should be considered together. This means that courts should expect that a reasonable internet user is more vigilant in looking for contractual terms when the context of the transaction reasonably implies a contractual relationship.

*Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (citations and quotation marks omitted). Beginning with visual design, courts generally require that: (1) the notice of the agreement "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it"; and (2) "the fact that a hyperlink [disclosing the terms] is present must be readily apparent." *See Berman*, 30 F.4th at 857. Both features are present here. The notice informing a user that they are assenting to the terms of an agreement appears directly below the field where they must enter their email address and directly above the Continue button that they must push to continue with the opt-in process. The text of the notice is dark and contrasts against the light background. The font size of the notice is smaller than that in the email address field or of the Continue button, but it is not prohibitively small. Thus, a reasonably prudent user would have seen the notice. *See, e.g.*, *Hodge*, 2026 WL 764679, at *6 (reasonable user would have seen notice where "notice was directly above the operative 'Next' button," "dark font color of the notice contrasts with the white background," and "font size is not unreasonably small").

Plaintiff argues that the notice "appears in extremely small, faint text positioned beneath large, bold promotional language and an eye-catching 'Continue' button." (*See* Dkt. No. 34 at 14-15.) The font is not as small or faint as Plaintiff insists, and the surrounding language is not so much more prominent as to distract a reasonably prudent user away from seeing the notice. Zooming out to examine the entire landing page on which the prompt appears, the overall

context also does not so deemphasize the notice that a reasonably prudent user would not see the notice above the Continue button (Dkt. No. 34-1 at 4):




*See, e.g.*, *Pizarro v. QuinStreet, Inc.*, No. 22-cv-02803-MMC, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (notice reasonably conspicuous where, among other things, webpage "is relatively uncluttered").

It is also readily apparent to a user that a hyperlink disclosing the terms of the agreement is present. The phrase "Terms and Conditions" is underlined and in blue font, which contrasts with the non-hyperlinked language in the notice. *See Godun*, 135 F.4th at 714 (Nelson, J., concurring) ("[T]he Platonic ideal of the hyperlink is blue and underlined . . . ." (citation omitted)); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77-78 (2d Cir. 2017) ("Moreover, a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found.").

Turning to the context of the transaction, the analysis concerns whether the "type of transaction contemplates entering into a continuing, forward-looking relationship." *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1017 (9th Cir. 2024) (citation omitted). Here, Plaintiff opted into receiving email marketing, which necessarily implicated a continuing,

forward-looking relationship, as Plaintiff would periodically receive emails until she opted out: "By clicking Continue, I accept the Terms and Conditions (with Arbitration Agreement) . . ., and I agree to receive promotional *emails . . ., which I can unsubscribe from at any time*." (Dkt No. 22-1 ¶ 13 (italic emphasis added).) Were the relationship one-time and not forward-looking, there would have been no reason to clarify that Plaintiff would receive emails (plural) or could unsubscribe.

Thus, both the visual design of Stim's website and the context of the transaction indicate that Plaintiff had reasonably conspicuous notice of the terms of her agreement. Plaintiffs' authorities involve website designs with much less conspicuous text. *See Berman*, 30 F.4th at 856-57 (no reasonably conspicuous notice where text printed in small font that "is barely legible to the naked eye," the "comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else," "the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text," and hyperlink was not clearly indicated as such because it was simply underscored); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-79 (9th Cir. 2014) (no notice of terms provided beyond conspicuous hyperlink in the bottom corner of each page).[3]

[3] *See also Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 866 (2016) (hyperlinks buried far below "buttons [the user] must click to proceed with the order" and in a color "that, to the unwary flower purchaser, could blend in with the Web site's lime green background"); *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1101 (S.D. Cal. 2018) ("Here, the Terms & Conditions hyperlink is more or less buried at the bottom of Defendant's webpage."); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63-64 (1st Cir. 2018) ("First, Uber's 'Terms of Service & Privacy Policy' hyperlink did not have the common appearance of a hyperlink. . . . Next, . . . this hyperlink was displayed . . . with similar features [to how other terms were displayed.] . . . [T]he hyperlink [was also displayed on] the bottom of the screen [on certain pages]. . . . [Thus,] [e]ven though the hyperlink did possess some of the characteristics that make a term conspicuous, the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention."); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) (website "contained no clear statement that [the plaintiff's] purchase was subject to *any* terms and conditions of sale," hyperlinks were not labeled as "Terms of Use," "Purchase," or "Service Agreement," and no language suggested the plaintiff's purchase "is subject to the agreement"); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 235-38 (2d Cir. 2016) (no reasonably conspicuous notice where, among other things, other information on the webpage "generally obscure[s] the

**b. Manifestation of Assent**

"A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement. . . . [T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Berman*, 30 F.4th at 857-58 (citations omitted). The email signup notice here satisfies this standard: "By clicking Continue, I accept the Terms and Conditions (with Arbitration Agreement) . . . ." (Dkt. No. 22-1 ¶ 13.) Thus, by clicking the Continue button, Plaintiff manifested her assent to the terms. *See, e.g.*, *Hodge*, 2026 WL 764679, at *7 ("Here, prospective Dashers were explicitly advised that '[b]y clicking "Next," I agree to the Independent Contractor Agreement.' . . . Therefore, the creation of Plaintiff's Dasher account in 2023 was an unambiguous manifestation of Plaintiff's assent to the terms of the ICA . . . ." (citations omitted)). Plaintiff opposes this conclusion based solely on evidentiary arguments that this Order already addressed above.

In sum, the parties entered into an agreement to arbitrate.

**B. The Court May Not Resolve Arguments About the Purported Unconscionability of the Arbitration Provisions**

Plaintiff argues that even if she entered into an agreement to arbitrate, the agreement is unconscionable and therefore unenforceable. Because the agreement clearly and unmistakably delegates "[q]uestions of arbitrability," including "whether [the] arbitration agreement is enforceable" to an arbitrator (*see* Dkt. No. 22-1 at 19), the Court may not resolve the argument. *See, e.g.*, *Wynwest*, 2025 WL 2603100, at *3.

To be sure, a court may evaluate the purported unconscionability of a delegation clause itself or of other provisions of an agreement implicating the unconscionability of a delegation clause. *See id.* at *1-3. For a court to consider such a challenge, however, "a party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments attacking the provision in its opposition to a motion to compel arbitration." *See*

---

message" and is "sufficiently distracting so as to temper whatever effect the notification has").

*Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023). Plaintiff, however, raises no unconscionability objection to the delegation clause itself and does not explain how the unconscionability objections that she does raise affect the unconscionability of the delegation clause. Accordingly, an arbitrator rather than the Court must address the unconscionability challenges raised by Plaintiff. *See, e.g.*, *Wynwest*, 2025 WL 2603100, at *3.

### C. Plaintiff Is Not Entitled to Discovery or a Trial

"The FAA provides for discovery and a full trial in connection with a motion to compel arbitration only if the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) (citation and quotation marks omitted). As discussed above, Plaintiff offers no evidence sufficient to raise a genuine dispute that she entered the agreement to arbitrate, so her request for discovery and a trial is **DENIED**. *See, e.g.*, *Driskill v. Experian Info. Sols., Inc.*, 753 F. Supp. 3d 839, 848-49 (N.D. Cal. 2024) (denying request for discovery because "[t]he making of the arbitration agreement is not at issue"); *Oatway v. Experian Info. Sols., Inc.*, No. 24-cv-00523-LK, 2024 WL 4879822, at *7 (W.D. Wash. Nov. 25, 2024) ("Here, there is no genuine issue of fact regarding the formation of the [arbitration] agreement, so discovery is unwarranted." (citations omitted)).

## IV. CONCLUSION

For the foregoing reasons, the motion to compel arbitration is **GRANTED**. This action is **STAYED** pending resolution of arbitration. The Parties shall file a joint status report every 180 days to update the Court on the arbitration proceedings, starting from the date of this Order, and shall file a status report within 14 days of the completion of arbitration proceedings.

**IT IS SO ORDERED.**

Dated: July 21, 2026

RITA F. LIN
United States District Judge